# Exhibit 3



# BIG LEAGUE ADVANCE

*SUMMARY OF PLAYER MARKETING OBLIGATIONS*

**Player Name: Gervon Dexter**

**Initial Term:** Effective Date - Date on which Player's eligibility to participate as a student-athlete pursuant to NCAA rules terminates

Player shall comply with the following marketing obligations:

## SOCIAL MEDIA POSTS

- Must post a minimum of **once a month annually**
- Must wear BLA logo and attire
- Must not include any distractions in the background
- Must be approved by BLA prior to posting
- Must include @BigLeagueAdv within the first line of the caption
- Must tag @BigLeagueAdv in the post
- @BigLeagueAdv, and any of its employees, representatives, or other players may be the only ones tagged in the caption and post
- Must comply with FTC Guidelines
- Must not contain any other person or entity in the caption or post, unless BLA approves
- Must not contain any watermark or non-BLA logos in the post
- Must keep post up permanently, unless BLA requests removal

## AUTOGRAPHS:
- Must provide **100 autographs/annually**

## EVENTS & APPEARANCES:
- Must appear at **2 events/annually**
- Must attend **2 content shoots/annually**
- Must collaborate or participate with BLA employees and other BLA Players at certain events and activities
- Must invite BLA to draft events

PLEASE NOTE THIS IS A SUMMARY OF PLAYER'S MARKETING OBLIGATIONS UNDER THE ATHLETE AGREEMENT ONLY. PLEASE REFER TO THE ENTIRE ATHLETE AGREEMENT FOR A COMPLETE SUMMARY OF PLAYER'S RIGHTS AND OBLIGATIONS THEREUNDER.

CONFIDENTIAL

**ATHLETE AGREEMENT**

This Agreement (this "**Agreement**") is entered into by and between Big League Advance Fund II, LP, a Delaware limited partnership ("**BLA**"), and Gervon Dexter ("**Player**"), as of the date set forth on the signature page (the "**Effective Date**"). For the purposes of this Agreement, BLA and Player each may be referred to herein as a "**Party**" and together as the "**Parties**."

WHEREAS, BLA has developed industry-leading predictive analytics with a variety of applications within the sports world, and would like to engage with Player under the terms and conditions described herein; and

WHEREAS, Player desires to partner with BLA and allow it to utilize his name, image, likeness, comments, biographical information and athletic reputation (the "NIL Services") as described herein to create additional financial security for himself and his family.

NOW, THEREFORE, the Parties hereto agree as follows.

1. **FEE.**

    **1.1**      In consideration for the Player's NIL Services and other obligations described herein, including if applicable during the Extended Term, BLA shall pay Player a fee (the "Fee"). The Fee shall consist of two components: (a) a one-time payment to Player of $436,485 (the "Cash Portion"); and (b) a charitable contribution of $5,000, as directed by Player (the "Charitable Contribution"). BLA shall pay one hundred percent (100%) of the Cash Portion of the Fee to Player within five (5) business days of the Effective Date. Player shall provide written instructions to BLA within twelve (12) months of the Effective Date specifying the charitable organization he wishes to receive the Charitable Contribution, and BLA agrees to make such Charitable Contribution within one (1) month of receiving instructions from Player; provided, that if BLA determines in its sole judgment that the Charitable Contribution is inappropriate for any reason, it shall promptly notify Player in writing and Player will have one (1) additional month to specify an alternative charitable organization. IF PLAYER FAILS TO PROVIDE BLA WITH WRITTEN INSTRUCTIONS IN EITHER OF THE TIME FRAMES LISTED ABOVE, OR IF BLA DOES NOT APPROVE ANY OF THE CHARITABLE ORGANIZATIONS PLAYER HAS OFFERED, THE CHARITABLE CONTRIBUTION WILL BE FORFEITED AND WILL BE DEDUCTED FROM THE AMOUNT OF THE UPFRONT PAYMENT.

    **1.2**      **Taxes.**  Player shall be solely responsible for the payment of all taxes that may be due in relation to his receipt of the Fee. BLA shall not be required to indemnify or "gross up" Player for the amount of any such taxes. Player shall indemnify BLA for and hold it harmless from and against any taxes of Player, which may be sought against, imposed upon or suffered by BLA or which BLA may incur as a result of BLA's failure to deduct and withhold such taxes from the Fee.

May 14, 2022

2.     **Name, Image, Likeness, Athletic Reputation.** In partial consideration for the Fee, Player
agrees to provide the NIL Services as described herein:

**2.1. License.** Player hereby grants to BLA and its Related Parties a perpetual, irrevocable,
royalty-free, and worldwide license for the duration of the Initial Term to use the Player's name,
image, likeness, comments, biographical information and/or athletic reputation for the
advertisement or publication of BLA or its products or services, or otherwise in connection with
the business of BLA, including in social media posts, interviews, online content, press releases,
and any other media. For clarity, the preceding grant of rights includes the right of BLA to refer
to Player as a "BLA Athlete" (or similar terms) in any media; provided, that BLA shall not have the
right to disclose the specific terms of this Agreement, which remain confidential as described in
Section 3.1. BLA shall have complete ownership of any image, recording, product, copy,
presentation or other material created pursuant to such license, including all intellectual
property interests ("Work Product"); provided, BLA shall not commercially exploit Work Product
or publicly utilize Player's name, image, and likeness following the expiration and/or termination
of the Initial Term unless it is to inform the public of the existence, but not the specific terms, of
this Agreement and the Parties' business relationship.    "Related Parties" means parents,
subsidiaries, affiliates, and successors of BLA. For clarity, the Parties understand that they both
shall comply with all of Player's university's compliance rules, regulations and applicable state
laws to the use of Player's name, image, likeness, comments, biographical information and/or
athletic reputation which may be in effect from time to time during the Initial Term; and any NFL
or other professional football team policies, rules and regulatons as may be in effect from time
to time during the Extended Term.

**2.2 Social Media Posts.** Player, at BLA's request, shall post a minimum of one (1) post per
month (each, a "Social Media Post") during the Initial Term promoting BLA or its products or
services on Player's Platform accounts. Player shall ensure that at all times throughout the Initial
Term: (a) each Social Media Post is accessible and viewable by all of Player's followers on Player's
Platform accounts; (b) Player does not delete the Social Media Posts for any period of time; and
(c) Player does not take any action to have its Platform account suspended, deleted or removed.
BLA may provide Player with content and/or material to be included in a Social Media Post. The
content of any Social Media Post shall be subject to BLA's final approval. Player shall remove
and/or repost any Social Media Post as directed by BLA. BLA expressly reserves the right to repost
and/or retweet Player's Social Media Posts during the Initial Term. BLA shall have the right to
maintain or retain, or not remove posts, reposts, retweets and any other social media updates
or uploads from BLA's own Platform accounts at the conclusion of the Agreement. The failure to
provide a Social Media Post in accordance with the terms set forth herein shall be deemed a
material breach of this Agreement.

**2.3. Autographs.** Player shall, on an annual basis for the Initial Term, autograph up to
one-hundred (100) items for BLA at BLA's discretion. The items for Player to autograph shall be
selected by BLA and provided at BLA's sole expense. BLA shall have all right, title and interest in
such autographed items. At BLA's election, such autographs may be made either (a) in person,
at a meeting between Player and a representative of BLA at a mutually agreed upon time and

2

CONFIDENTIAL

location (such in-person meeting not to exceed one hour); or (b) remotely via the use of a reputable shipping or courier service selected by BLA and at BLA's expense, in which case Player shall return the autographed items to BLA in the manner prescribed by BLA within thirty (30) days after receiving such items. Player may, at his/her/her option, customize autographed items for BLA-designated recipients.

2.4. **Personal Appearances and Player Events.** During the Initial Term and upon reasonable notice provided by BLA, Player shall, on an annual basis (i) make at least two (2) personal appearance for the purpose of promoting BLA or its products or services, and (ii) attend and participate in up to two (2) days of promotional work at BLA's request and expense (collectively, the "BLA Events"). BLA Events shall include, but are not limited to, virtual meetups, photoshoots, trips, charity events, sporting events, media interviews, podcasts, and parties. BLA will make reasonable attempts to provide Player with at least fourteen (14) days' notice of such requests, but the Parties acknowledge that such notice may not be available at all times. In the event of a conflict, the Parties will attempt to negotiate such conflicts in a manner that is the least disruptive to both Parties. BLA shall have all right, title and interest in all the property created at BLA Events, including, but not limited to, all intellectual property such as original content, all of the foregoing to be treated as Work Product in accordance with the terms set forth in Section 2.1 of this Agreement.

(a) **BLA Event Travel Rules**. When the Player travels for BLA Events, BLA shall pay for Player's travel expenses incurred to fulfill Player's obligations to perform the NIL Services as follows:

    i.   Travel Fares: BLA will pay the travel fares for the Player's travel, including travel to destination from the closest airport or train station including luggage charges included at the time of purchase, transfers, taxes and fees. Travel fares (including Cruise fares) will be provided at the economy class level, but Player may upgrade such fares at her/his own expense.

    ii.   Hotel/Cruise Accommodations/Lodging: Player will be provided standard single occupancy accommodations in hotels and cruises at BLA's Expense. Other lodging arrangements may include condo or house rental. Player may be required to share the common areas of such house or condo rentals with other Player associated with BLA or representatives of BLA, but will include a private bedroom for Player and whenever possible, a private bathroom.

    iii.  Meals: Player will be provided with meals by BLA when available. If meals are not available or practical, Player will be provided with per diem payment to be determined prior to each trip to be used by Player for meals.

May 14, 2022

iv.   Ground Transportation: Local transportation (taxies, ride-share, etc.) will be reimbursed by BLA at actual costs upon return from travel, or will be paid for by BLA at that time of transportation if a BLA representative is present.

v.    Incidentals / Personal Expenses: Incidental items, personal expenses, souvenirs, and other personal items shall be paid for by Player.

vi.   Companion Travel: All costs or expenses incurred by persons accompanying Player will be borne solely by such companions or Player.

**2.5. Invitation to National Football League Draft and Related Events.** If Player receives an invitation to attend the National Football League draft he shall give to BLA at least one (1) VIP invitation to attend and sit at the Player's table during the draft, and shall also ensure that BLA receives at least one (1) VIP invitation to any draft-related events hosted by or on behalf of Player.

**2.6 Collaboration.** Upon request by BLA, Player shall have the obligation to collaborate or participate in activities described in this Section 2 with other players or employees affiliated with BLA. If such request by BLA would cause a conflict of interest with Player, Player shall provide written notice of such conflict as soon as Player becomes aware of such issue and the Parties will work together in good faith to try to avoid or resolve such conflict.

**2.7. Excluded Activities.** For avoidance of doubt, during any period during the Initial Term of this Agreement where Player is a student at an NCAA college, university, or similar educational institution, Player shall not be required to engage in any of the activities set forth in this Section 2 while engaged in activities organized by the athletic department of the Player's NCAA college, university, or similar educational institution or in a manner that conflicts with the rules, requirements, or obligations imposed by such NCAA college, university, or similar educational institution, or in a manner that is inconsistent with applicable law as may be in effect now or from time to time. Moreover, the Parties understand and agree that the NIL Services described in this Section 2 shall terminate as of the expiration of the Initial Term.

3.   **CONFIDENTIAL INFORMATION**

**3.1      Confidential Information.** The terms of this Agreement and any additional information provided by BLA to Player prior to and during the Initial and Extended Term of this Agreement that BLA designates as Confidential Information shall be treated as Confidential Information. Additionally, any information Player provides to BLA pursuant to Section 6 of this Agreement shall also be treated as Confidential Information. For purposes of this section, the Party providing Confidential Information shall be known as a "Disclosing Party" and the Party receiving Confidential Information shall be known as a "Receiving Party." BLA is the Disclosing Party with regard to the terms of this Agreement.

**3.2      Use and Disclosure Restrictions.** These use and disclosure restrictions only apply to a Receiving Party. Both Parties agree to (a) protect Confidential Information from

4

unauthorized dissemination and use; (b) to use Confidential Information only for the performance of this Agreement and the exercise of any rights under this Agreement; (c) not to disclose Confidential Information, or any part or parts thereof, except as set forth in Section 3.3; (d) to undertake whatever action is necessary (or authorize the other Party to do so in the name of such Party) to prevent or remedy any breach confidentiality obligations herein set forth or any other unauthorized disclosure of any Confidential Information; and (e) not to remove or destroy any proprietary or confidential legends or markings placed upon or contained within the Confidential Information by the other Party.

**3.3**     **Exclusions.**  The foregoing restrictions on disclosure and use shall not apply to the Disclosing Party or with respect to any Confidential Information that: (a) is or becomes publicly known through no act or omission of the Receiving Party; (b) was known to the Receiving Party without confidential or proprietary restriction before receipt from the Disclosing Party; or (c) becomes known to the Receiving Party without confidential or proprietary restriction.  In addition, the Receiving Party may use or disclose Confidential Information of the Disclosing Party if (i) approved in writing, or (ii) the Receiving Party is legally compelled to disclose such Confidential Information, provided, however, that prior to disclosure, the Receiving Party shall cooperate with the Disclosing Party, at the Disclosing Party's expense, in protecting against any such disclosure and/or obtaining a protective order narrowing the scope of such disclosure and/or use of the Confidential Information.  Player may disclose the terms and conditions of this Agreement: (A) in confidence, to legal counsel; (B) in confidence, to any person or agency with which Player has signed a contract to serve as an agent, accountants, banks, and financing sources and their advisors; (C) as required to satisfy any law, NCAA, or university compliance reporting obligation imposed on Player, and (D) in connection with the enforcement of this Agreement or any rights hereunder.

**3.4**     **Equitable Relief.**     The Parties agree that, due to the unique nature of Confidential Information, the unauthorized disclosure or use of the other Party's Confidential Information or any other breach of any provision of this Section 3 will cause irreparable harm and significant injury to the other Party, the extent of which will be difficult to ascertain and for which there will be no adequate remedy at law.  Accordingly, each Party agrees that the other Party, in addition to any other available remedies, shall have the right to seek an immediate injunction and other equitable relief enjoining any breach or threatened breach of this Section 3 without the necessity of posting any bond or other security.  Each Party shall notify the other Party in writing immediately upon becoming aware of any such breach or threatened breach.

4.     REPRESENTATIONS, WARRANTIES, AND COVENANTS.

**4.1**     **Mutual Representations, Warranties, and Covenants.**     Each Party hereby represents and warrants to the other Party that (a) it has all necessary power and authority to execute and deliver this Agreement, to perform its obligations under this Agreement, and to consummate the transactions contemplated by this Agreement; (b) to the best of such Party's knowledge, it is not a Party to any agreement or understanding with any third party that interferes with or will interfere with its performance of its obligations under this Agreement; and

5

CONFIDENTIAL

(c) it has taken all action required to make this Agreement a valid and binding obligation of such Party.

**4.2     Player's Representations, Warranties, and Covenants.**     Player hereby represents, warrants, and covenants, as applicable, to BLA that (a) the statements contained in Exhibit A are and will be true and correct as of the Effective Date and (b) Player shall not intentionally structure any Contract to avoid making payments that would otherwise be payable under this Agreement; and (c) Player has not entered into any agreement with any other entity under which such entity has the right to receive any portion of Player's Professional Football Earnings, whether in the form of any commission, royalty, or other payment based on a percentage or set amount; and that Player will not grant such right without the prior written consent of BLA.

**4.3     Contact Information.** Player shall, to the best of his/her ability, notify BLA of any changes to Player's telephone number, address, and email address (the "Contact Information") within five (5) business days of such change.

**4.4     Obligations of BLA**.  BLA shall have no duties to Player other than providing the Fee and complying with the terms and conditions of this Agreement.  BLA has no duty to provide advice or support to Player regarding his/her professional Football career or earnings, and is not acting as an agent or advisor.

**4.5     Amateurism and NCAA Athletics Eligibility**. Player understands that he/she is responsible for understanding any rules governing amateurism, including those relating to the receipt of payment or compensation for use of his/her name, image, likeness, and athletic reputation, and NCAA or other athletic eligibility rules and guidelines and the impact that the Fee may have upon Player's compliance with such rules or status or eligibility with any such governing body.

**4.6     FTC and Platform Rules & Regulations.** Player understands that he/she is responsible for understanding and complying with the FTC rules and regulations governing endorsements and Social Media influencers. Player also is responsible for understanding and complying with all Platform rules and terms of use.

5.     PLAYER OBLIGATIONS DURING EXTENDED TERM.

**5.1**     Once the Extended Term commences, if applicable, and without any further action on the part of Player or BLA, in partial consideration for the Fee, Player agrees to make Professional Football Payments to BLA. **"Professional Football Payments"** means fifteen percent (15%) of Player's Professional Football Earnings over the course of the Extended Term, calculated annually.

(a)     "**Professional Football Earnings**" means all of Player's pre-tax earnings or remuneration paid to Player by a Professional Football League or Team during the Extended Term of this Agreement.  Such earnings shall include, without limitation, any wages, salary (including Player's Team Payments), Bonuses

6

(including deferred bonuses), payments made to Player by reason of Player's participation in any playoff game, all-star game, or other championship event, and any other compensation whatsoever earned by Player in his service to the Professional Football League or Team of any kind related to or for Player participating in Football Activities, and participating at events during the Extended Term of this Agreement.

(b)     Professional Football Earnings shall be calculated in US Dollars without taking into account any encumbrances or other deductions in connection with the payment of agents, financial advisors and any other fee arrangements based on a percentage of Player's income (or any portion thereof).

**5.2**     **Obligation to Make Payments**.  Player shall have no obligation to make any Professional Football Payments to BLA unless and until the Player has received any Professional Football Earnings. Player shall have no obligation to pay to BLA any difference between the aggregate payments made by Player to BLA during the Extended Term and the Fee if such payments are less than the Fee.

**5.3**     **Timing of Professional Football Payments**.  During the Extended Term, Player shall pay fifteen percent (15%) of Player's Professional Football Earnings earned or received during the previous month to BLA by the 15th day of every month.

**5.4**     **Assisting BLA in Receiving Professional Football Payments.**   Player agrees to take all reasonable steps to ensure that BLA receives Professional Football Payments due under this Agreement, including but not limited to executing any authorizations or other documents allowing for the withholding of amounts due to BLA and remission of funds to BLA.

(a)     *Automatic Withdrawal of Professional Football Payments from Professional Football Earnings*. If Player enters into a guaranteed Contract with a Professional Football Team, BLA will work with Player to arrange for the automatic withdrawal, and debit to BLA, of the Professional Football Payments from all payments to the Player under the guaranteed Contract. To the extent that it is not commercially practical, without unreasonable burden on Player, for the Professional Football Payments from Professional Football Earnings to be delivered directly to BLA from any such payor of Professional Football Earnings, or any assignment of Professional Football Earnings is deemed invalid or unenforceable, then Player shall receive such portion of the Professional Football Payments as agent for BLA and shall deliver such portion of the Professional Football Payments to BLA as and when (or as promptly as practicable after) such Professional Football Earnings are received by Player; provided, however, that in no case shall any Professional Football Payments from Professional Football Earnings be delivered later than fifteen (15) days following receipt of such funds by Player (or any other person or entity on behalf of Player). Player shall be solely responsible for ensuring that all Professional Football Payments from Professional Football Earnings are timely

7

paid to BLA and no failure of automatic withdrawal or debit shall obviate or mitigate Player's payment obligations

(b)     *Assignment of Player's Right to Receive Professional Football Payments.*  To secure BLA's right to receive the Professional Football Payments, to the maximum extent permitted under applicable law in effect from time to time, Player hereby assigns (as and when earned), or shall assign when Player has an assignable interest in any future Professional Football Payments, to BLA all right, title and interest in and to the Professional Football Payments.

(c)     *Irrevocable Payment Instruction Letter.*   Player shall execute an irrevocable payment instruction letter as provided in Exhibit C ("Instruction Letter") in order to ensure that BLA is able to receive any payments due directly from a payor of Professional Football Earnings or any other person or entity in possession of Player's Professional Football Earnings.  This obligation is in addition to Player's obligations as set forth in Section 5.4 (a) above.  BLA will hold the executed copy of the Instruction Letter in abeyance and will not submit such item unless Player fails to remit any payment due to BLA in a timely manner.  Player understands that in the event that Player fails to pay BLA in a timely manner, BLA will submit a copy of the executed Instruction Letter to a payor of Professional Football Earnings or any other person or entity in possession of Player's Professional Football Earnings and by signing the Instruction Letter, Player authorizes BLA to do so.  Player further acknowledges that BLA's submission of an Instruction Letter to a payor of Professional Football Earnings or other person or entity according to this section shall not constitute a disclosure of Confidential Information in violation of this Agreement.

(d)     *Effect of Marriage on Professional Football Payments.*  Player shall, if applicable, use reasonable efforts to secure the signature of Player's spouse in substantially the form of spousal consent attached hereto as Exhibit C. In the event that Player fails to secure such signature, and as a result a portion of the Professional Football Earnings of Player is deemed "community property," or Player's spouse can otherwise claim legal ownership to any Professional Football Earnings, then Player shall nonetheless be required to calculate and deliver any installment payments of the Professional Football Payments based on the entirety of the Professional Football Earnings as applicable (including any such portion thereof that is deemed to be such spouse's share of community property or otherwise property of such spouse).

5.5     **Payment Method.**  Except as otherwise approved by BLA in writing or to the extent that Professional Football Payments are made directly to BLA, each payment of the Professional Football Payments shall be made in US Dollars via wire transfer pursuant to the wire transfer instructions provided by BLA to Player in writing, as may be updated by BLA from time to time.

8

**5.6    Additional Provisions.**

(a)    In the event that Player is prohibited from making payment of any installment of the Professional Football Payments at the time when same is due and payable to BLA hereunder by reason of any applicable laws, Player shall promptly notify BLA and, at BLA's request, Player shall deposit any such blocked funds to the credit of BLA in a bank or banks or other depository institution as permitted by law and designated in writing by BLA, or pay them promptly to such persons or entities as BLA may designate in writing consistent with applicable law.

(b)    Player acknowledges and agrees that time is of the essence in connection with performance of its obligations hereunder. In the event that any payment due to BLA hereunder is not paid in full by the applicable date due, then, without limiting any other rights or remedies of BLA, (i) Player shall also pay to BLA a late payment fee of ten percent (10%) of the amount which is due but unpaid in addition to the amount due, (ii) interest on the unpaid amount will begin to accrue at the rate of the lesser of (1) two percent (2%) per month or (2) the maximum rate permitted by applicable law, measured from the date such amount was due until it is fully paid; (iii) if player is subject to a guaranteed Contract, all amounts that are to be payable to BLA during the applicable Season shall become immediately due and payable; and (iv) Player shall reimburse BLA for all costs and expenses (including related attorneys' fees) incurred by BLA in connection with collecting or attempting to collect such payment.

**5.7    Transfer.** Player agrees that prior to selling, transferring, exchanging, or encumbering ("Transfer") any additional interest in future earnings, whether Professional Football Earnings, or any other form of earnings, he/she shall provide BLA with written notice of his/her intent to do so, along with the terms and conditions of that proposed Transfer. Player agrees that BLA shall have the option to acquire the additional interest offered by Player on the same terms and conditions as the proposed sale. BLA shall have 30 days after receiving Player's written notice to exercise its right of first refusal ("ROFR"). BLA's ROFR shall terminate on the earlier of: (a) when BLA declines the ROFR, or (b) 30 days after receiving Player's written notice.

**6.    INFORMATION RIGHTS**

**6.1    Material Changes.** Subject to Player's compliance with all rules, regulations, standards or requirements of the Player's university, the NCAA, or other applicable Professional Football League and/or governing body, and all other agreements between Player and any other party or entity, including his/her Team, Player shall promptly notify BLA in writing if at any time during the Initial and Extended Term of this Agreement there occurs any occurrence that results in any of the representations or warranties made by the Player on Exhibit A to be untrue in any material respect.

**6.2    Contracts.** Player shall provide, upon request from BLA, copies of all applicable Contracts. Player shall promptly notify BLA in writing and provide copies of all relevant documents and correspondence related to each such occurrence (including copies of all applicable Contracts), in the event that (a) Player receives any notice of termination, cancellation, breach or default under any such Contract; (b) Player becomes aware of any event which, with the passage of time or the giving of notice or both, would result in any material default, breach

9

or event of noncompliance by Player under any such Contract; (c) Player becomes aware that any other party to any such Contract is in material breach thereof; or (d) there are any renegotiations of or outstanding rights to renegotiate any material amounts paid or payable to Player under any such Contract with any person or entity, or Player receives any demand for such renegotiation.

**6.3**       **Additional Information**. Player shall provide to BLA such additional information as BLA shall reasonably request from time to time (in a reasonable amount of time after such request) in connection with the Professional Football Earnings, including but not limited to, personal metrics, such as viewing and engagement figures or other data and analytics related to Player, in connection with the Player's Platform accounts and Social Media accounts; provided, that BLA shall use commercially reasonable efforts to limit any such requests to no more than once per calendar quarter.

**6.4**       **Records; Audit Rights.** Player shall maintain (until at least twelve (12) months after termination of this Agreement), records of all items relating to Professional Football Earnings during the Extended Term, including, but not limited to all W2s, 1099s, K1s and any other documents related to Player's income.   During the Extended Term and for twelve (12)

months thereafter, BLA or its representatives may, at any time (but in no event more frequently than once during a twelve (12) month period) inspect and make copies of Player's records described herein. Such audit shall be at BLA's sole cost and expense, provided that if an audit reveals an underpaymnt of any payments payable under this Agreement by greater than five percent (5%), then Player shall reimburse BLA for its reasonable and documented audit costs. Player shall promptly pay to BLA any underpaid amount, together with any interest thereon as provided in Section 5.6. BLA shall provide Player with reasonable advance written notice that it shall be conducting an audit.

7.    **INDEMNIFICATION.**

   **7.1**    **Indemnification by Player.**  Player shall defend, indemnify and hold BLA, its affiliates, officers, directors, employees, agents, consultants and independent contractors (the **"BLA Indemnified Parties"**) harmless against any loss, liability, damage or cost in connection with, resulting from or arising out of, directly or indirectly (whether or not involving a third party) (a) any breach by Player, including directly or indirectly by any Player affiliate, agency, agent or other third-party representative, of any of the terms, covenants, conditions, representations or warranties contained in this Agreement; (b) demands for commissions or otherwise of any agent or other third-party representative of Player; or (c) enforcing the indemnification rights of the BLA Indemnified Parties hereunder.

   **7.2**    **Indemnification Process.**  In the event that a BLA Indemnified Party receives an assertion of any claim or demand or commencement of any proceeding against the BLA Indemnified Party by any third party (a **"Claim"**), the BLA Indemnified Party shall promptly deliver a written notice to Player of the Claim; provided that delay or failure to notify Player shall not relieve Player of any liability that it may have to the BLA Indemnified Party, except to the extent the defense of such Claim is prejudiced by the BLA Indemnified Party's delay or failure to give such notice. Such notice shall describe in reasonable detail (to the extent known by the BLA Indemnified Party) the facts constituting the basis for such Claim and the amount of the claimed

10

May 14, 2022

damages. Within twenty (20) days after delivery of such notice, Player may, upon written notice thereof to the BLA Indemnified Party, assume control of the defense of such Claim with counsel selected by Player, subject to the BLA Indemnified Party's approval, which shall not be unreasonably withheld, conditioned or delayed. If Player does not so assume control of the defense of the Claim, the BLA Indemnified Party shall have the right to control such defense at its own expense and Player shall have the right to participate in such defense at its own expense. If Player controls the defense, it shall not agree to any settlement of, or the entry of any judgment arising from, any Claim without the prior written consent of the BLA Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed.

8.    **LIMITATION OF LIABILITY.**

NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY: (a) IN NO EVENT SHALL BLA BE LIABLE FOR ANY DAMAGES OR OTHER LOSSES FOR LOSS OF PROFITS, LOSS OF BUSINESS, INTERRUPTION OF BUSINESS, LOSS OF REPUTATION, OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES OF ANY KIND OR OTHER ECONOMIC LOSS ARISING FROM OR RELATING TO THIS AGREEMENT, EVEN IF BLA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, HOWEVER CAUSED, AND (b) TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, BLA'S ENTIRE LIABILITY ARISING FROM OR RELATING TO THIS AGREEMENT OR THE SUBJECT HEREOF, UNDER ANY LEGAL THEORY (WHETHER IN CONTRACT, TORT, INDEMNITY OR OTHERWISE), IF ANY, SHALL NOT EXCEED THE FEE AMOUNT.

9.    **DISPUTE RESOLUTION**

    **9.1    Binding Arbitration**. All claims arising out of or relating to this Agreement (including their formation, performance, and breach), the Parties' relationship with each other shall be finally settled by binding arbitration administered by JAMS in accordance with the provisions of its Comprehensive Arbitration Rules & Procedures, available at https://www.jamsadr.com/rules-comprehensive-arbitration/, but excluding any rules or procedures governing or permitting class actions. Claims under $250,000 will be governed by JAMS's Streamlined Arbitration Rules, available at https://www.jamsadr.com/rules-streamlined-arbitration/, excluding any rules or procedures governing or permitting class actions.

    (a)    An arbitration demand shall be made within a reasonable time after the claim, dispute, or other matter in question has arisen, and in no event shall it be made more than two years from when the aggrieved Party knew or should have known of the controversy, claim, dispute, or breach.

    (b)    The Parties shall negotiate in good faith to agree upon the selection of an arbitrator. If the Parties are not able to agree on an arbitrator, the arbitrator selection shall proceed under Rule 12 of the JAMS Streamlined Arbitration Rules.

    (c)    The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these terms, including, but not limited to any claim that all or any part of these terms are

void or voidable, or whether a claim is subject to arbitration. The arbitrator shall be empowered to grant whatever relief would be available in a court under law or in equity. The arbitrator's award shall be written, and binding on the Parties and may be entered as a judgment in any court of competent jurisdiction.

(d)     The Parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial. They further understand that, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court.

(e)     If Player unsuccessfully attempts to void, nullify, or otherwise terminate this Agreement and is unsuccessful in whole or in part, Player agrees to pay all legal fees and costs incurred by BLA related to the arbitration or legal proceeding in which such challenge has been made.

(f)     The Parties further agree that any arbitration shall be conducted in their individual capacities only and not as a class action or other representative action, and the Parties expressly waive their right to file a class action or seek relief on a class basis. THE PARTIES AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. If any court or arbitrator determines that the class action waiver set forth in this paragraph is void or unenforceable for any reason or that an arbitration can proceed on a class basis, then the arbitration provision set forth above shall be void in its entirety and the Parties shall be deemed to have not agreed to arbitrate disputes.

(g)     The arbitration proceedings and arbitration award shall be maintained by the Parties as strictly confidential, except as is otherwise required by court order or as is necessary to confirm, vacate or enforce the award and for disclosure in confidence to the Parties' respective attorneys, tax advisors and senior management and to family members of a party who is an individual.

**9.2     Location of Arbitration.**     Arbitration shall be initiated in the District of Columbia, United States of America, the Parties agree to submit to the personal jurisdiction of any court in the District of Columbia, in order to compel arbitration, to stay proceedings pending arbitration, or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator.

**9.3     Governing Law.**   This Agreement is to be construed in accordance with and governed by the internal laws of the State of Delaware without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of Delaware to the rights and duties of the parties.

**10.    TERM AND TERMINATION.**

**10.1     Term.**   The "Term" of this Agreement shall consist of two components:

CONFIDENTIAL

(a)     The "Initial Term" of this Agreement shall commence on the Effective Date and, unless sooner terminated by either Party in accordance with this Agreement, terminate upon the date on which Player's eligibility to participate as a student-athlete pursuant to NCAA rules terminates.

(b)     The "Extended Term" shall automatically commence upon the conclusion of the Initial Term, and unless sooner terminated by either Party in accordance with this Agreement, continue in full force and effect until the twenty-fifth (25th) anniversaery of the Effective Date without any additional Fee by BLA.

**10.2     Termination by Mutual Consent**. The Agreement may be terminated by mutual written consent of Player and BLA.

**10.3     Termination for Breach.** Either Party may terminate this Agreement if the other Party is in breach of this Agreement and fails to cure such breach within thirty (30) days after delivery of a written notice of such breach by such non-breaching Party.

**10.4     Termination for Death.** If Player dies before the expiration of the Term of this agreement, this Agreement shall remain in effect and shall apply to all Professional Football Earnings earned or received after death.

**10.5     Effect of Termination.** The provisions of Sections 4, 5 (to the extent that any payments due thereunder remain payable after termination or expiration of this Agreement) 6, 7, 8, 9, and 11 shall survive the expiration or any termination of this Agreement. Termination of this Agreement by either Party shall not act as a waiver of any breach of this Agreement and shall not act as a release of either Party from any liability (including, without limitation, for payments) for breach of such Party's obligations under this Agreement. Neither Party shall be liable to the other Party for damages of any kind solely as a result of terminating this Agreement in accordance with its terms, and termination of this Agreement by a Party shall be without prejudice to any other right or remedy of such Party under this Agreement or applicable law.

**10.6     Disclaimer.** EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, AND TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW EACH PARTY EXPRESSLY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING ANY WARRANTIES OF DESIGN, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NONINFRINGEMENT OF THIRD PARTY RIGHTS, OR WARRANTIES ARISING FROM A COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OR TRADE PRACTICE. BLA shall not be liable for any claims or demands for commissions or otherwise of any agent of Player.

11.     GENERAL PROVISIONS.

**11.1     Notices**. Any notice, request, demand or other communication required or permitted hereunder shall be in writing, including by electronic mail, shall reference this Agreement and shall be deemed to be properly given: (a) when delivered personally or when receipt of email is provided or expressly acknowledged; (b) seven (7) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (c) two (2) business

13

days after deposit with a private industry express courier, with written confirmation of receipt. All notices shall be sent to the address set forth on the signature page of this Agreement and to the notice of the person executing this Agreement (or to such other address as may be designated by a Party by giving written notice to the other Party pursuant to this Section 11.1).

11.2   **Assignment.** This Agreement may not be assigned, in whole or part, whether voluntarily, by operation of law or otherwise, by Player. Other than by merger, operation of law, or change of control, BLA may not assign this Agreement without Player's prior, written consent if at the time of such assignment BLA has not yet paid the Cash Portion of the Fee to Player. After BLA has paid the entire Fee, it may assign its rights under this Agreement to any person for any reason. Subject to the preceding sentence, the rights and liabilities of the Parties hereto shall bind, and inure to the benefit of, their respective assignees and successors and is binding on the parties and their successors and assigns.

11.3   **Mutual Non-Disparagement.** Each Party shall refrain from making, issuing, publishing or otherwise disseminating any disparaging or unfavorable comments or statements (whether written or oral) about the other Party during or after the Term; provided, however, that this Section shall not prohibit any Party from exercising its rights to commence or defend a legal action subject to the terms of the Agreement nor shall it prohibit BLA from making any filing or disclosure as required under law, rule or regulation.

11.4   **Waiver.** The waiver by either Party of a breach of or a default under any provision of this Agreement, shall be in writing and shall not be construed as a waiver of any subsequent breach of or default under the same or any other provision of this Agreement, nor shall any delay or omission on the part of either Party to exercise or avail itself of any right or remedy that it has or may have hereunder operate as a waiver of any right or remedy.

11.5   **Severability.** If the application of any provision of this Agreement to any particular facts or circumstances shall be held to be invalid or unenforceable by a court of competent jurisdiction, then (a) the validity and enforceability of such provision as applied to any other particular facts or circumstances and the validity of other provisions of this Agreement shall not in any way be affected or impaired thereby; and (b) such provision shall be enforced to the maximum extent possible so as to effect the intent of the parties and reformed without further action by the parties to the extent necessary to make such provision valid and enforceable.

11.6   **Relationship of the Parties.** Nothing contained in this Agreement shall be deemed or construed as creating a joint venture, partnership, agency, employment or fiduciary relationship between the Parties. Neither Party nor its agents has any authority of any kind to bind the other Party in any respect whatsoever. The relationship of the Parties described in this Agreement is non-exclusive.

11.7   **Entire Agreement.** This Agreement and any exhibit(s) attached hereto and incorporated herein by reference, constitutes the entire agreement between the Parties concerning the subject matter hereof and supersedes all prior or contemporaneous representations, discussions, proposals, negotiations, conditions, agreements and communications, whether oral or written, between the Parties relating to the subject matter of this Agreement, including the Big League Advance, LLC Term Sheet by and between BLA and

14

**CONFIDENTIAL**

Player. No amendment or modification of any provision of this Agreement shall be effective unless in writing and signed by a duly authorized signatory of each of BLA and Player.

15

CONFIDENTIAL

12.    DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

"**BLA Events**" has the meaning set forth in Section 2.4 of this Agreement.

"**BLA Indemnified Parties**" has the meaning set forth in Section 7.1 of this Agreement.

"**Bonuses**" mean any additional payments made to Player by a League and/or for achieving individual or Team: results, rankings, awards and/or contractual milestones. These can include, but are not limited to, Player's signing bonus, Contract incentives, and/or playoff/championship bonus.

"**Claim**" has the meaning set forth in Section 7.2 of this Agreement.

"**Contract**" means any contract with a Professional Football League or Team to which Player is or becomes a party as a player.

"**Disclosing Party**" has the meaning set forth in Section 3.1 of this Agreement.

"**Extended Term**" has the meaning set forth in Section 10.1(b) of this Agreement.

"**Fee**" has the meaning set forth in Section 1.1 of this Agreement.

"**Football Activities**" means any activity or action taken by the Player related to playing football.

"**Initial Term**" has the meaning set forth in Section 10.1(a) of this Agreement.

"**Platform**" means any website, application, or other form of technology that facilitates the creation or sharing of information, ideas, interests and other forms of expression via on-line communities and/or networks including for example, but not limited to YouTube, Twitter, TikTok, Instagram, Snapchat, Pinterest, and Facebook. Any such technology that meets the definition of Platform despite not being listed herein shall be considered a Platform, even if such entity does not exist at the time that this Agreement was executed.

"**Professional Football Earnings**" has the meaning set forth in Section 5.1(a) of this Agreement.

"**Professional Football League**" means the entity or entities responsible for establishing and maintaining the rules for professional football, including, but not limited to, promoting the game, and preserving the sport's integrity. Professional Football League further means any association of Football teams that compete against each other in which players are paid a salary or other compensation for their participation in the

16

league including, but not limited to, the National Football League ("NFL"), the Canadian Football League ("CFL"), the XFL ("XFL"), the Arena Football League ("AFL"), and the United States Football League ("USFL"). Any entity that meets the definition of Professional Football League despite not being listed herein shall be considered a Professional Football League, even if such entity does not exist at the time that this Agreement was executed.

"**Professional Football Payments**" has the meaning set forth in Section 5.1 of this Agreement.

"**Receiving Party**" has the meaning set forth in Section 3.1 of this Agreement.

"**Related Parties**" has the meaning set forth in Section 2.1 of this Agreement.

"**NIL Services**" has the meaning set forth in the preamble to this Agreement.

"**Social Media**" means forms of electronic communication (such as, but not limited to, websites for social networking and microblogging) through which users create or participate in online communities to share information, ideas, interests, personal messages, and other content (such as videos), podcasts, or other forms of recorded message delivery.

"**Social Media Post**" has the meaning set forth in Section 2.2 of this Agreement.

"**Team**" means a group of players that work collectively to compete in football games.

"**Team Payment**" means any payment provided by a Team to a Player for services related to Football Activities or for participating in the collective effort of a Team, including but not limited to Bonuses and salaries.

"**Term**" has the meaning set forth in Section 10.1 of this Agreement.

"**Transfer**" has the meaning set forth in Section 5.7 of this Agreement.

17

**CONFIDENTIAL**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by duly authorized representatives of the parties as of the Effective Date.

**Big League Advance Fund II, L.P.**

By: _Michael Schwimer_
Michael Schwimer (May 17, 2022 11:53 EDT)
_____
Michael Schwimer
Chief Executive Officer

Effective Date: _____ May 17, 2022 _____

Player Name: Gervon Dexter

Fee Amount: $436,485

Player Signature:
_gervon dexter_
gervon dexter (May 17, 2022 09:52 EDT)
_____

Player Address:
_____

Phone Number: _____
Email Address: ~~gervon.dexter@ufl.edu~~

18

CONFIDENTIAL

## EXHIBIT A

### Player Questionnaire

Review each of the following statements and initial each statement where indicated. By placing your initials next to each below statement you hereby represent, warrant and covenant, as applicable, that each such statement is true and complete.

> **In addition, please provide copies of all documents or other information specifically requested as part of the below statements.**
> **IT IS IMPORTANT FOR PLAYER TO ENSURE THE ACCURACY AND COMPLETENESS OF ALL INFORMATION PROVIDED TO BLA.**

| Initials | Statement |
|---|---|
| *gd* | 1. I fully understand the terms and conditions of the Agreement, and I have had the opportunity to be represented by an attorney, tax advisor and other professional representatives of my choosing in the review, negotiation and execution of the Agreement and performance of my obligations thereunder. |
| *gd* | 2. I have reviewed the contract in my native language or a language that I am fluent in. |
| *gd* | 3. Except as required by NCAA, my university's compliance policies, rules and regulations and applicable state NIL laws, I do not require any consent, approval, authorization or permit from, or filing or notification to, any person or entity in connection with my execution and delivery of the Agreement, and performance of my obligations thereunder. |
| *gd* | 4. I fully understand that I am authorizing BLA to use my name, image, likeness and/or athletic reputation for the advertisement or publication of BLA or its products or services, or otherwise in connection with the business of BLA including, but not limited to, on BLA's website or in its promotional materials, and that BLA shall have complete ownership of any image, recording, product, copy, presentation or other material created pursuant to such authorization, including all intellectual property interests. |
| *gd* | 5. I fully understand that under the terms of the Agreement I will be required to perform certain services for BLA, including making personal appearances at |

events, performing promotional work for BLA, signing autographs and making social media posts.

6. I have not made, nor will I hereafter make, any grant, license or assignment whatsoever, which might conflict with or impair the complete enjoyment of the rights and privileges granted to BLA under the Agreement.

7. Except as described in Schedule 1 hereto, no other person or entity has any right to receive any portion of my Professional Football Earnings and in the form of any commission, royalty or other payment based on a percentage (or set amount, i.e., a flat fee arrangement based on a specific Contract) of some or all of the Professional Football Earnings. To the extent the foregoing is not accurate, I have secured all necessary consents to make available for review by BLA (and have so made available) a complete copy of each Contract (or summary thereof, if an oral Contract) pursuant to which any such payments are owed.

8. I understand that I am personally responsible to make payments under this Agreement and that the amount I owe will not be increased or reduced based upon my current or subsequent arrangements or agreements with any other individual or firm including, but not limited to, my advisors, agents, attorneys or financial advisors.

9. I have timely paid any taxes, fees or withholdings required by any state or federal or international government authority. I have also timely filed all forms and documentation required in connection with any such taxes, fees or withholdings and am not subject to any audit by a government authority in connection with any taxes or governmental fees. I am not subject to any unsatisfied judgments or tax liens.

10. I have not conducted business, applied for or secured credit in, or received any official government identification under, any name or alias, other than the name listed in Agreement.

11. Without limiting the effect of any statement in this Exhibit A (Player Questionnaire), all of the documents and information that I have provided, and will provide, to BLA in connection with the Agreement are true, correct and complete in all material respects, except with respect to any statement that, by its terms, is already limited as to materiality. My responses to this questionnaire (and any documents or other information provided by me to BLA in connection with the Agreement) do not, and will not, contain any untrue statement or fail to state a material fact necessary to not make any of such information not misleading, in light of the circumstances in which it was provided.

A-2

CONFIDENTIAL

Player Name: Gervon Dexter

Player Signature:

*gervon dexter*
gervon dexter (May 17, 2022 09:52 EDT)

A-3

Exhibit B

By initialing below, you represent that you have read and understand each statement, and that it is consistent with your understanding of this Agreement:

| Initials | |
|---|---|
| *gd* | 1. By signing this Agreement, you will receive $436,485. In exchange for $436,485, you are authorizing BLA to use your name, image, likeness, and athletic reputation to market or promote BLA and have agreed to perform certain services for BLA, including making personal appearances at events, performing promotional work for BLA, signing autographs and making social media posts. |
| *gd* | 2. In exchange for payment of ($436,485) you have agreed to give Big League Advance fifteen percent (15%) of your future Professional Football Earnings (including Bonuses), and any other item as described in the Agreement. If you do not receive any Professional Football Earnings you will not owe Big League Advance any payments. |
| *gd* | 3. As an example, of the potential amounts that you may be required to pay Big League Advance under this Agreement, if you make $100mm in Professional Football Earnings over the 25 years from the date you sign this Agreement, you will be required to pay us $15mm as you earn that money. |
| *gd* | 4. You will have to pay taxes to the United States on the money you receive from Big League Advance. |
| *gd* | 5. For all Professional Football Earnings, earned or received during the previous month, you will pay BLA on the 15th day of the following month during the duration of the Agreement. |
| *gd* | 6. If you do not pay us when you have an obligation to do so, you are in breach of the Agreement, and we will seek to enforce the Agreement against you. In addition, if you fail to pay us any amount due when it is due, Player shall also pay to BLA a late payment fee of ten percent (10%) of the amount which is due but unpaid in addition to the amount due, and interest on the unpaid amount will begin to accrue at the rate of the lesser of (i) two percent (2%) per month or (ii) the maximum rate permitted by applicable law, measured from the date such amount was due until it is fully paid. |

CONFIDENTIAL

7. You understand that before selling, transferring, exchanging, or encumbering any additional interest in future earnings, whether future Professional Football Earnings covered by this Agreement, you will provide BLA with written notice of your intention to do so, and provide BLA the option to acquire the additional interest on the same terms and conditions as the proposed sale.

8. You understand that you are required to notify BLA within 5 business days of any changes to your contact information, including email address, residential and/or mailing address, and/or telephone number(s).

9. You understand that you are responsible for understanding all amateurism, payment, and eligibility rules and guidelines, including those of the NCAA, as well as any FTC rules and regulations governing endorsements and Social Media influencers.

10. You understand and agree that Delaware Law shall govern any dispute about this Agreement and that you are making this Agreement pursuant to the internal laws of Delaware. You also agree that Delaware's internal laws are the laws that shall be used when interpreting and enforcing this Agreement under any circumstance and this choice of laws shall not be affected by the location where you are signing this Agreement or where you are residing at the time that you sign this Agreement.

11. You understand and acknowledge that:

   a. BLA will hold the executed copy of the Instruction Letter in abeyance and will not submit such item unless you fail to remit payment due to BLA in a timely manner;

   b. In the event that you fail to pay BLA in a timely manner, BLA will submit a copy of the executed Instruction Letter to a payor of Professional Football Earnings or any other person or entity in possession of your Professional Football Earnings and by signing the Instruction Letter, you authorize BLA to do so;

   c. You further acknowledge that BLA's submission of an Instruction Letter to a payor of Professional Football Earnings or

CONFIDENTIAL

| | |
|---|---|
| | other person or entity shall not constitute a disclosure of Confidential Information in violation of this Agreement. |
| *gd* | 12. You understand that this Agreement is between you and BLA. You agree that there are no other individuals or firms that are intended to be beneficiaries of your agreement with BLA. However, if any person or firm are considered to be third-party beneficiaries of your Agreement with BLA by a court or arbitrator, that you will be and are solely responsible for payments to them or satisfaction of their beneficiary rights. |

Player Name: Gervon Dexter

Player Signature:   *gervon dexter*
gervon dexter (May 17, 2022 09:52 EDT)

May 14, 2022                                B-3

CONFIDENTIAL

## Exhibit C

### IRREVOCABLE PAYMENT INSTRUCTIONS

Date:_____

PROFESSIONAL FOOTBALL EARNINGS SOURCE: _____

Address:        _____

                _____

                _____

Attn:           _____

Re: Payment of Amounts to Big League Advance ("BLA")

Ladies and Gentlemen:

I, Gervon Dexter ("Player"), have entered into an agreement with BLA (the "Agreement") pursuant to which, among other things, Player has assigned all right, title and interest in and to an amount equal to fifteen percent (15%) of all gross monies or other consideration of any type (the "Professional Football Amount") that I may earn from PROFESSIONAL FOOTBALL EARNINGS SOURCE:_____ ("Company").

Notwithstanding anything to the contrary contained in the Agreement or any prior instructions received by Company, unless and until Company receives written instructions from BLA to the contrary, effective as of the date of this letter 1.) Company is hereby instructed and directed to pay BLA 15% of all Professional Football Amounts from any amounts payable by Company to me (including, but not limited to any person or entity identified in my contract to play Football with Company); 2.) such amount shall be delivered to BLA concurrent with any payment of the remaining amounts due to me; and 3.) payment shall be made by federal funds wire transfer or electronic depository transfer directly to the following bank account:

[INSERT WIRE INSTRUCTIONS]

In the event Company receives any different instructions from BLA with respect to the disposition of Professional Football Amounts, Company is hereby irrevocably authorized and

May 14, 2022

**CONFIDENTIAL**

directed to follow such instructions, without inquiry as to BLA's right or authority to give such instructions.

Except only as expressly provided herein with respect to the applicable deposit instructions, this Irrevocable Payment Instructions cannot be changed, modified, or terminated, except by written agreement signed by BLA and Player. Photocopies of this letter shall be considered the same as originals.

Please also accept this letter as acknowledgement that I authorize BLA to complete and execute any paperwork or forms which Company requires in order to fulfil the intent of this letter and to ensure that BLA is paid in a timely manner.

Very Truly Yours,

By: Gervon Dexter

*gervon dexter*
gervon dexter (May 17, 2022 09:52 EDT)

      Player Signature

May 14, 2022

C-2

CONFIDENTIAL

## Schedule 1

List of persons or entities that have any right to receive any portion of Player's Professional Football Earnings and details regarding all such rights:



### Exhibit D

### Spousal Consent

### (*only required if Player is married*)

I, [                    ], being the spouse of Gervon Dexter, who is a signatory to that certain Agreement by and among my spouse and Big League Advance Fund II, L.P. ("**BLA**"), dated as of [EFFECTIVE DATE] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**"; capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Agreement). I have had the opportunity to consult with legal counsel regarding this consent and the Agreement; and I am aware that pursuant to the provisions of the Agreement, my spouse agrees to grant a percentage of my spouse's Professional Football Earnings in the form of all right, title and interest in the Professional Football Amounts to BLA, which may include a community property interest I may have therein, if any. I hereby acknowledge that my spouse has sold, assigned and conveyed the Professional Football Amounts to BLA on the terms, and subject to the conditions, contained in the Agreement. Furthermore, I hereby consent to such grants of the Professional Football Amounts, acknowledge that my spouse's and my interest (if any) and any community property interest in the Professional Football Amounts (if any) is subject to the terms of the Agreement, and approve of the provisions of the Agreement and any actions or performance arising therefrom, as applicable, to the extent the same affects any of my community property interest, if any. I further agree that my spouse may join in any future amendment, restatement, supplement or modification of the Agreement or any ratification of the foregoing in each case without any further consent from me. Each of my spouse and BLA shall be a third-party beneficiary of this Spousal Consent.

This Spousal Consent shall inure to the benefit of my spouse and BLA, and shall be binding on the undersigned and on the undersigned's successors, assigns, representatives, heirs and legatees.

Name: [PLAYER SPOUSE]
Date:

| Form **W-9** | **Request for Taxpayer** | Give Form to the |
| (Rev. November 2017) | **Identification Number and Certification** | requester. Do not |
| Department of the Treasury Internal Revenue Service | ▶ Go to *www.irs.gov/FormW9* for instructions and the latest information. | send to the IRS. |

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Gervon L Dexter SR

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☑ Individual/sole proprietor or single-member LLC

☐ C Corporation    ☐ S Corporation    ☐ Partnership    ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

**6** City, state, and ZIP code

Requester's name and address (optional)

**7** List account number(s) here (optional)

**Print or type.**
**See Specific Instructions on page 3.**

---

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

or

**Employer identification number**

| | | | – | | | | | |

---

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| **Sign Here** | Signature of U.S. person ▶ | *gervon dexter*<br>gervon dexter (May 17, 2022 09:52 EDT) | Date ▶ May 17, 2022 |

---

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

Cat. No. 10231X

Form **W-9** (Rev. 11-2017)

## Player Banking Information

Please fill out the form below so BLA can initiate the Fee.

Beneficiary Name: ___Gervon L dexter_____

Bank Name: _____ ████████████ _____

Account Number: ___ ████████ _____

Wire Routing Number or SWIFT Code ████████████ _____

Fee Disbursement ($): ___ALL AT ONCE_____

Additional Comments/Notes: _____

If Beneficiary's Name is different than Player's name, please check the box below to authorize this payment instruction and provide a brief explanation for the relationship to the player.

Signature: ___*gervon dexter*___
                gervon dexter (May 17, 2022 09:52 EDT)

## Player Banking Information

Please fill out the form below so BLA can initiate the Fee.

Beneficiary Name: _____

Bank Name: _____

Account Number: _____

Wire Routing Number or SWIFT Code: _____

Fee Disbursement ($): _____

Additional Comments/Notes: _____

If Beneficiary's Name is different than Player's name, please check the box below to authorize this payment instruction and provide a brief explanation for the relationship to the player.

Signature: _____

# Gervon Dexter BLA Athlete Agreement[54]

Final Audit Report                                                                      2022-05-17

| | |
|---|---|
| Created: | 2022-05-16 |
| By: | Victoria Lares (vlares@bigleagueadvance.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAZpMqXLnv-sE2vswg8PgU6ml5sBVamBDx |

## "Gervon Dexter BLA Athlete Agreement[54]" History

📄 Document created by Victoria Lares (vlares@bigleagueadvance.com)
2022-05-16 - 7:42:00 PM GMT- IP address: 173.79.221.80

📧 Document emailed to gervon dexter (gervon.dexter@ufl.edu) for signature
2022-05-16 - 7:58:10 PM GMT

📄 Email viewed by gervon dexter (gervon.dexter@ufl.edu)
2022-05-17 - 1:34:29 PM GMT- IP address: 174.64.123.153

🖊 Document e-signed by gervon dexter (gervon.dexter@ufl.edu)
Signature Date: 2022-05-17 - 1:52:07 PM GMT - Time Source: server- IP address: 174.64.123.153

📧 Document emailed to Michael Schwimer (mschwimer@bigleagueadvance.com) for signature
2022-05-17 - 1:52:09 PM GMT

📄 Email viewed by Michael Schwimer (mschwimer@bigleagueadvance.com)
2022-05-17 - 3:52:47 PM GMT- IP address: 173.79.221.80

🖊 Document e-signed by Michael Schwimer (mschwimer@bigleagueadvance.com)
Signature Date: 2022-05-17 - 3:53:03 PM GMT - Time Source: server- IP address: 173.79.221.80

✅ Agreement completed.
2022-05-17 - 3:53:03 PM GMT

🅰 Adobe Acrobat Sign